H.H. Henderson testified: That he lives about seven miles north of Pittsboro. Was in Pittsboro 25 September, and frequently during the day in the barroom of A. P. Terry, and was drinking some, but was not drunk. Took four drinks during the day. Came to Pittsboro about 9 in the morning. Knows what happened and was able to attend to his business. Left the barroom about 8 or a little before. That he had about $40 or $45 in his pocket, in greenbacks, and a few dollars in silver. Pulled this money out of his pocket while in the barroom, and had it out several times during the day. Defendant was present when he had the money out and knew he had it, and saw it. That he came to town on horseback and left his horse hitched behind the store of O. S. Poe Son, about 75 or 80 yards from the barroom. When he left the barroom for his horse, it being about dark, the defendant and another party (Will Baldwin) followed him to his horse. He did not need their assistance, and did not ask them to go with him. He had a bundle of socks and a bundle of shoes in his arms. They followed him to his horse. Baldwin held the horse by the bridle. Defendant Leach pretended to assist him on his horse, and after he was on the horse the defendant, with his hands still on him, attempted to take the money from his pocket. The money was in a left-hand front pants pocket, and the defendant saw him put it *Page 519 
there before he left the barroom. That he said to him: "Never mind my pocket, I will attend to my pocketbook myself. Take your hand out of my pocket. You are trying to take my money"; and defendant replied, "I will see you later." He then rode off in a walk, and did not see him any more. The road toward his home was west about one-fourth mile, and then turned at right angles north. He rode along in a (830) walk till he reached the corner of Hal London's, which was the corner of the right angle, and rode down the north road about one-fourth mile, and as he was in a few yards of the Taylor place he was struck from behind and knocked from his horse. Remembered no more until about daybreak next morning, when he was aroused by the mail rider and others, who came out from town for him, to wit: Mr. Clark, Mr. Hill, and Aaron Degraffenreid. His money was gone, and the shoes and socks and his knife were lying by him in the road.
T. B. Fowler testified: That he lived in Pittsboro and saw Henderson in town on the day he was struck — Friday, 25 September. Saw him late in the evening. He was drinking but not drunk. He was well acquainted with the road leading out to Henderson's home, and it runs west after leaving Poe's store, about one-fourth mile, and then turns north at right angles. That leaving Poe's store, where Henderson's horse was hitched, and going through the field to the point where Henderson was struck is about one-fourth mile nearer than going around the road. That the way to go through the field, and a direct line to the said point after leaving Poe's store, is to go up by the postoffice and down the alley at Exline's Hotel, out by the old schoolhouse in the field, or go down by Lineberry's house, at the corner of the block, and go up to the schoolhouse, meeting the alley from Exline's, and that the distance from Poe's store to the schoolhouse is the same either way. The schoolhouse is at the opposite corner of the block from Poe's store — a few yards beyond. The direct way from the schoolhouse to the point on the main road (the Snow Camp road) is through an old field, crossing a creek, and some old straw fields — some cultivated land. He went out this way the morning after the robbery, and just after he crossed the creek he (831) found tracks alongside an old hedge and followed these tracks, and they went directly to a large tree on the road, or a few yards above where Henderson was found next morning after the robbery. Tracks made by a number 10 shoe on left foot, which was run down on the heel. Right foot apparently straight. After describing the route through an old field the witness stated that he followed the tracks, and that they left an old dim path soon after crossing the creek, and that by going that way from Poe's store it was a quarter of a mile nearer than by going around the road, but leaving the place where Henderson was found, where there was a large quantity of blood on the ground, he found the *Page 520 
same tracks going away, but crossing the fence between the points where they came into the road and where the blood was found. They came into the path of the tracks going out about 50 yards from the road, and in coming this way they passed through an open field, and were made by some one while running. All these tracks were evidently made the day or night before, and were nearly fresh. On the following day (Haywood having been arrested and placed in jail that evening), the day of his first search, he, in company with others, took the shoes found on the defendant when arrested and carried them to these tracks, and tried them in those which were the plainest, and they fit exactly, and the run-down shoe settled exactly in the track of that foot. That, besides the run-down part of it, the left shoe had a broken place in the sole, near the toe, and on the right side. That he noticed this in the track — peculiarity in the track — and when the shoe was placed in it he found that this peculiar rough place, which he had noticed in the track, fit exactly. On the right-hand track, at the heel, he observed a rise in (832) the middle of the track — a small mound — as if the dirt in the middle of the heel had been pressed down even with the remainder of the bottom of the heel. When he saw the right shoe of defendant at the trial he noticed that there was a smooth hole in the middle of the right heel as if it had been burned by a hot iron. When placed in the track this cavity in the heel fit the mound of the track. Witness was convinced that the shoe made the track. The shoe was half-soled, and the track showed it was made by a shoe which had been half-soled. "I went and got defendant's shoes. He did not object to giving them up. He was in jail."
F. C. Poe testified that he is a member of the firm of O. S. Poe Son. Saw Henderson on 25 September. He was frequently in his store, and was in there just as he was closing his store. He was not drunk, but had been drinking. Saw him have a roll of money, and he paid him some just as he was leaving his store. Knows the point where Henderson is said to have been found. Saw a large quantity of blood there on the ground. Went with witness Fowler, and saw track, as testified to by Fowler. This witness testified substantially as did Fowler.
Will Baldwin testified: That he was with defendant on the night of 25 September. Went with him to Henderson's horse. Defendant had his arm partly around Henderson when he got on his horse, and after he got on the horse he heard Henderson say to him: "Take your hand out of my pocket, you damned thief. You are trying to steal my money. I know what you are doing." Defendant replied, "I am not trying to take your money." I did not hear defendant say, "I will see you later." Think I could have heard it if it had been said. Henderson rode off, and he and some other colored boys, who had come up, started over to Sheriff Brewer's corn-shucking. That Brewer's was directly east from *Page 521 
the store. That Henderson rode off on the road going directly (833) west, and the postoffice was north. That they said to defendant, "Come on; let's go on over to the shucking," and he replied, "I am not going now; I may come later." That defendant immediately left them, and went toward the postoffice, and to the corn-shucking. That they all left where the horse was hitched as soon as Henderson left, and defendant left the witness as soon as he reached the corner of the store. That he knows where the old schoolhouse is, as testified to by Fowler, and to go there from Poe's store it is the same distance to go down by Lineberry's or to go up by the postoffice and down the alley at Exline's Hotel. Did not see defendant any more until late that night when he came over to the corn-shucking, and that the distance from the store, where they parted, to the point where the robbery was said to have been committed is about one-fourth mile, and that the distance to Sheriff Brewer's from the store is nearly half a mile, making the distance from the place of the robbery to Brewer's nearly a mile, one direction from the store; the other, the other direction.
A. P. Terry testified: That he is the keeper of the barroom at Pittsboro, and knows Henderson. That he was in his barroom several times during the day 25 September, 1896. Was drinking a little, but not drunk. Had some money, in greenbacks, and had it out several times, treating different parties. He last saw him between 7 and 8 o'clock at night and when he left he was not drunk. Witness states that he was at his barroom very early next morning, and that defendant Leach came down there very early, and that his pants legs were nearly covered with "beggar lice." The witness Fowler had already testified that in going through the old field described by him his clothing became nearly covered with beggar lice, and that in following the tracks described he went through these old fields. (834)
A. B. Clark testified: That he lived in Pittsboro, and that early in the morning of 25 September he was informed that Henderson was seriously injured and was found in an unconscious condition on the Snow Camp road, leading north from Hal London's. That he went there in a hack to see him, and found him lying on the side of the road a few yards below the Taylor place and just beyond the oak tree testified to by Fowler, and that there was a large quantity of blood in the road. Henderson was on the other side of the road, lying coiled up, with the back of his head badly bruised in two places and bleeding. The rim of his hat, which was lying near by, was cut. Two small holes or torn places through the hat at the edge of the rim, as if made by some stroke. Henderson was barely conscious. Witness and others picked him up, placed him in the hack and brought him to his hotel, where he remained till the day of the trial. That the bruises or wounds were just below the right *Page 522 
ear — a little toward the middle of the back of the head. That he found the articles — shoes and socks — and also found his pocketknife and a half-pint bottle nearly full of whiskey lying side by side, as if drawn out of the pocket together, and that he was informed by the mail rider that Henderson was out there, and of his condition.
The defendant introduced no evidence, nor did he except to any of the evidence offered by the State or to any rulings of the court. There was a verdict of guilty, and defendant thereupon moved for a new trial on the ground that the testimony did not warrant the verdict. The motion was refused, and defendant appealed.
The defendant was indicted for highway robbery; verdict of guilty and judgment thereon, from which he appealed.
The defendant introduced no evidence on the trial, nor did he except to any introduced by the State, nor did he except to any ruling of the court. But after the verdict had been rendered he moved for a new trial "on the ground that the testimony did not warrant the verdict." If this motion is to be taken to mean that there was no evidence, or not sufficient evidence to authorize the submission of the case to the jury, it was made too late.S. v. Kiger, 115 N.C. 746; S. v. Keath, 83 N.C. 626; S. v. Hart,116 N.C. 976. But as this ruling is regarded as somewhat technical, we have carefully examined the whole of the testimony in the case and consider it not only sufficient to authorize its submission to the jury, but if believed, and that was a question for the jury, we do not see how they could have found otherwise than they did.
There is no error, and the judgment is
AFFIRMED.
Cited: S. v. Wilson, 121 N.C. 657.
(836)